35 U.S. 460 (____)
10 Pet. 460
*JOSEPH WALLINGSFORD, PLAINTIFF IN ERROR,
v.
SARAH ANN ALLEN, FOR HERSELF AND CHILDREN.
Supreme Court of United States.

*462 The case was argued by Mr. Brent, for the plaintiff in error; and by Mr. Dandridge and Mr. Key, for the defendant.
*464 Mr. Justice WAYNE delivered the opinion of the court.
This was a petition in the court below, by the appellees, for freedom; complaining that they were unjustly held and claimed by the *589] *appellant as his slaves. The petitioner gave in evidence a deed of manumission for herself and two children, from one Rachel Wallingsford. Her third child was born after she was manumitted.
*465 It appears that Rachel Wallingsford resided in Washington several years previous to the date of the deed of manumission, living apart from her husband, the appellant: that she had a suit pending against him in Maryland, where he resided, for alimony, and had been allowed, by the order of the court, 120 dollars per annum; pendente lite. Some time after this allowance had been made, her husband gave her the petitioner, Sarah Ann, and some other property, in discharge of her alimony: that after this agreement between them, the said Rachel continued to live in Washington until her death, having kept Sarah Ann in her service until the deed of manumission was executed. After the death of Mrs. Wallingsford, the appellant claimed Sarah Ann and her children as his slaves. All of the children were born after Sarah Ann was given up by the appellant to Mrs. Wallingsford. The appellant proved, at the time the deed of manumission was made, that Rachel Wallingsford was his lawful wife. It also appears, by a petition filed by the appellant in the county court of Prince George county, Maryland, to get the interlocutory order for alimony suspended, and which is in evidence in the cause, that the appellant and his wife, having had repeated disagreements, as she alleged on account of her husband's habitual incontinency with a woman in their own house, Mrs. Wallingsford left her habitation and refused to live with him. The charge of incontinency is denied by the husband; but he admits, after his wife's departure, and upon her refusing to comply with his solicitations to return and live with him, that by an express agreement between them, he gave to her the woman Sarah Ann and other property, with two notes of hand, one for 120 dollars and the other for 200 dollars; in all amounting to 900 dollars; which was the amount the wife brought with her when they were married, and of which the appellee Sarah Ann was a part. This was to be received by the wife in full of all further claim for support; and the husband was to be discharged from the payment of alimony decreed by the court. Wallingsford having refused to pay the notes of hand, and the suit for alimony being still pending, the parties again met, and a final separation took place between them; upon the footing, that the wife was to retain the woman, Sarah Ann; that each was to retain besides, "the property each had, and to be quits for ever." In consideration of the husband *having agreed to this, the wife agreed to yield her claim for[*590 alimony, granted by the interlocutory order of the court, and was to discontinue her suit.
On the trial of the cause, the admission of the deed of manumission, as evidence, was excepted to by the defendant; but the court overruled the exception. The defendant also prayed the court to instruct the jury, if they should believe, from the evidence, that Mrs. Wallingsford held the petitioners by virtue of an agreement between her and her husband, without the intervention of a trustee, that the agreement was void; and could give to her no power to manumit the slaves held under it: also, if the jury shall believe, from the evidence, that the agreement was made without a covenant on the part of a *466 trustee, or some person capable of contracting with the husband, that the same was null: also, if the jury shall believe that the agreement was made on condition that Mrs. Wallingsford should relinquish all claim to alimony, and that she did not comply with such condition, and did prefer against him a subsequent claim for alimony, that the agreement cannot be enforced against the defendant: and lastly, to instruct the jury, if they shall believe, from the evidence, that the petitioners or any of them, at the time of the execution of the deed of manumission, were not able by their labour to procure for themselves sufficient food and raiment, with other necessaries of life, that then the said deed was inoperative to them. The court gave the last instruction to the jury, but refused to give the rest. And upon the prayer of the petitioner, instructed the jury, if they should believe from the evidence, that Sarah Ann Allen and her children were of healthy constitutions, and sound in mind and body, and that the mother was capable by labour to procure them sufficient food and raiment, with other necessaries of life, and did maintain them; then such children are not under the incapacity intended by the law of Maryland, in the act providing for the manumission of slaves.
The section of the act of 1796, 2 Maxcy's Laws of Maryland 360, is as follows: "that where any person or persons possessed of any slave or slaves within this state, who are or shall be of healthy constitutions, and sound in mind and body, capable by labour to procure to him or them sufficient food and raiment, with other necessaries of life, and not exceeding forty-five years of age, and such person or persons possessing such slave or slaves as aforesaid, and being willing and desirous to set free or manumit such slave or slaves, may, by writing under his, her, or their hands and seals, evidenced by two *591] *good and sufficient witnesses at least, grant to such slave or slaves his, her or their freedom; and that any deed or writing whereby freedom shall be given or granted to any such slave, which shall be intended to take place in future, shall be good to all intents, constructions and purposes whatsoever, from the time that such freedom or manumission is intended to commence by the said deed or writing; so that such deed and writing be not in prejudice of creditors; and that such slave, at the time such freedom or manumission shall take place or commence, be not above the age aforesaid, and be able to work and gain a sufficient livelihood and maintenance, according to the true intent and meaning of this act." The act prescribes how such deeds shall be executed, acknowledged and recorded; and upon a compliance with what is prescribed in those regards, a copy of the record, duly attested under the seal, &c. &c., "shall at all times hereafter be deemed, to all intents and purposes, good evidence to prove such freedom."
We will consider, together, the exception taken to the introduction of the deed of manumission as evidence, the last instruction asked of the defendant, and that asked by the petitioners, both of which were given to the jury by the court. The deed was not objected to for any deficiency in its execution, or on account of its not having *467 been properly acknowledged and recorded. The last was done as far as that part of the law can be complied with in the district of Columbia. The deed was also acknowledged by the person making it, on the day it was executed, before a justice of the peace. It was then properly sent to the jury as evidence of the fact of manumission; and what its validity might be to give freedom, was a question of law to be determined by the court. As to the instructions asked by the defendant and the petitioners, relative to the petitioners being comprehended within the incapacity of the section of the act of Maryland just recited; both, we think, were rightly given by the court. That of the defendant was very general, and the court was not obliged by it to particularize to which of the petitioners it was intended to be applied. It was, therefore, correctly answered by a general instruction directing the jury to inquire into the fact; at the same time stating what the law was, if the jury should find the fact as the counsel of the defendant supposed it to be. That of the petitioners being more specific, was intended to obtain the court's interpretation of the act upon the point put; and we think the answer of the court, is in the true spirit of the law. We think the terms of the *act of Maryland, and the policy intended by it, were meant[*592 to prevent the manumission of slaves, who, from infancy, age, or decrepitude, would become burthensome to the community at the time the deed of manumission should take effect: and to such as were over the age, after which manumission is prohibited. But the slave manumitted must either be positively in the latter predicament; or be so decrepid, if under the age of forty-five; and if neither one nor the other, and being in infancy, it must stand so unrelated to any other free person, coloured or white, that it can have no claim, natural or artificial, to support from any one; and must, therefore, be at once a charge upon the charity of the community, or a charge upon its poor laws. It would be an unreasonable restraint upon the privileges of manumission, as it is granted in this act, if it were interpreted to exclude the manumission of mother and an infant child, the former being of healthy constitution and able to maintain it, as of other children who, in the natural progress of human life, would be able, in a few years, to maintain themselves by labour, and who would find in their adolescence, persons who would gladly maintain them for the services they could render. If this construction of the act could not prevail, there can be no fixed age in childhood when manumission can take effect; and the act would be made to operate differently upon persons by no certain rule. The legislature having laid down the age after which manumission shall not be made, a strong presumption is raised that it did not mean to exclude all infants absolutely from the benefits of the act, or it would have said so in terms; or have fixed an age when, in childhood, manumission should be allowed. If the policy of the law is to prevent slaves from being manumitted who would be burthensome to the community, we cannot hesitate in believing that the object will be accomplished by relying upon those natural affections of a mother for her child, *468 which have always been found strong enough to cherish and sustain it; except in some unnatural instances, as when the true nature of woman has been turned aside by some dreadful superstition or extraordinary necessity.
We are aware that opinions have been expressed in the courts of Maryland different from our conclusion, in regard to the manumission of children: but the point of a mother and infant manumitted at the same time, and the mother being in any way able, by her labour, to maintain her offspring; has not yet been decided against by the courts of Maryland, so far as we can gather from their *593] *reports. These opinions too, having been expressed since the cession of the district of Columbia to the United States, the courts in the district are not to be controlled by them in the interpretation of the act under review; as they would be, and as this court would be, by the decisions of state courts upon state statutes affecting local rights and interests.
The fourth instruction asked by the defendant, which the court refused to give, is, if the jury shall believe that the agreement between Wallingsford and wife was, that he should transfer the petitioner to her on condition that she should relinquish all claim to alimony against him; and that she did not comply with the condition, and did prefer against him a subsequent claim for alimony: that then the said agreement cannot be enforced against the defendant; nor can he be deprived of any of his rights by virtue of said agreement. We think this instruction was rightly refused; for though it is not denied that the suit for alimony had not been discontinued, and was pending when Mrs. Wallingsford died, the legal consequence would not be, that the agreement would be avoided by its not having been observed in that particular. The non-performance of the agreement in that regard, did not restore to the defendant the ownership of property for which he had received a valuable consideration, by the relinquishment of his wife's alimony; of which he had the full benefit during her life; and continues to enjoy in the greater means he is presumed to have from having been relieved from the payment of the wife's alimony. But the instruction was asked in face of the evidence; which establishes the fact, that the substantial parts of the agreement were complied with, as the defendant had never been called upon for any part of the alimony, after the agreement was made, until the death of Mrs. Wallingsford. A failure upon the part of the wife to comply with this part of the agreement, gave to the husband a good ground in equity to have the suit discontinued; but did not invalidate the agreement.
The remaining exceptions to be considered, are those relating to the nullity of the agreement; because it was made without the intervention of a trustee, or some one capable of contracting with the husband. The court refused to give such instructions.
The inability of the wife in this instance to contract or to take any interest from her husband, without the intervention of a trustee, was argued, upon the restraints imposed upon women by the common *469 *law, during coverture. This is a case which cannot be so [*594 considered. Neither the nature of the action, by which the petitioners sue to have their freedom established; nor the agreement between Wallingsford and his wife; would permit this court to take so narrow a view of the case. Every feature of the agreement is an appeal to have it tested by those principles of equity which have been applied to maintain a separate interest in women, acquired from their husbands during coverture; whether the same were made by the intervention of trustees or not; when the transfer was fairly made upon a meritorious or valuable consideration.
Agreements between husband and wife, during coverture, for the transfer from him of property directly to the latter, are undoubtedly void at law. Equity examines with great caution before it will confirm them. But it does sustain them when a clear and satisfactory case is made out that the property is to be applied to the separate use of the wife. Where the consideration of the transfer is a separate interest of the wife, yielded up by her for the husband's benefit, or of their family; or which has been appropriated by him to his uses. Where the husband is in a situation to make a gift of property to the wife; and distinctly separates it from the mass of his property for her use. Either case equity will sustain, though no trustee has been interposed to hold for the wife's use. In Moore v. Freeman, Bunb. 205, it was determined, that articles of agreement between husband and wife are binding in equity, without the intervention of a trustee. Other cases may be cited to the same purpose. In regard to grants from the husband to the wife, an examination of the cases in the books will show, when they have not been sustained in equity, it has been on account of some feature in them impeaching their fairness and certainty, as that they were not in the nature of a provision for the wife; or when they interfered with the rights of a creditor; or when the property given or granted had not been distinctly separated from the mass of the husband's property. In Scanning v. Hyle, 3 P. Wms. 334, Lord Talbot assumed the doctrine, that femes covert could have a separate interest by their husband's agreement. In the case of Lady Arundel v. Phipps, 10 Ves. 146, 149, Lord Eldon held, that a husband and wife after marriage could contract, for a bona fide and valuable consideration, for a transfer of property from him to her. In Sheppard v. Sheppard, 7 Johns. Ch. Rep. 57, it is said, husband and wife may contract, for a bona fide and valuable consideration, for a transfer of property from him to her. *In Walles v. Hodge, 2 Swanst. 97, it is said, husband [*595 may convey to the wife a chattel. In the case of a gift from the husband to the wife, it is held valid when the husband, by some distinct act, divests himself of his property. As, for instance, in the case of Lucas v. Lucas, 1 Atk. 270, the lord chancellor held, that the transfer of 1000 pounds South Sea annuities by the husband, in the name of the wife, was so decisive an act, as amounted to an agreement by the husband that the property should become hers. It is not necessary to review here the cases of gifts to the wife by the husband, *470 which have been sustained in equity. They are alluded to, to show how far equity has gone in maintaining transfers of property by the husband to the wife, without the intervention of a trustee; and when there was no valuable consideration money from the wife to the husband. But the case before us is one where a transfer of property must be considered as having been made for a valuable consideration. It was given in lieu of alimony, decreed by a court of competent jurisdiction, pendente lite; and passed the property as fully to the wife, as if the husband had conveyed it to a third person for a valuable consideration. In regard to that property, Mrs. Wallingsford is to be considered as a feme sole; and her right to dispose of it followed as a matter of course.
Judgment of the circuit court affirmed.